UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    **Plaintiff,**<br><br>v.<br><br>DOUGLAS HAWKINS,<br><br>    **Defendant.** | CRIMINAL NO. 5:21-110-KKC<br><br><br>OPINION AND ORDER |

*** *** ***

This matter is before the Court on Defendant Douglas Hawkins' motion for acquittal or, in the alternative, for a new trial. (DE 62.) For the following reasons, the Court denies the motion.

**I.      Background[1]**

Defendant Douglas Hawkins worked as an investment advisor and certified financial planner for his company, Douglas Hawkins Investments ("DHI"). Todd Avery is his business partner. Defendant is also a lawyer with his own law firm, Douglas Hawkins Law, PLLC.

In 2013, Defendant became involved with True Wholesale Houses, LLC ("TWH"), which sold promissory notes on various properties. Prior to his involvement, he traveled to Oregon to meet with TWH associates, visited TWH offices, and reviewed available financial information. (Gov't Ex. 17-A at 30:06-32:30.) He also contacted Kentucky's Department of Financial Institutions ("DFI") for guidance on the type of investments offered by TWH, inquiring about the types of disclosures that he would need to make if he sold the notes.

---

[1] The Court's recitation of background facts is not exhaustive; it only references those facts and pieces of evidence necessary to contextualize the instant motions. The Court's analysis *infra* will further expound upon the evidence presented to assess whether relief is warranted.

(Gov't Ex. 2Z at USA-00011337.)  In response, a DFI examiner sent him a set of applicable statutes and regulations, and advised him of the disclosures that he would need to include in any advertising.  (*Id.* at USA-00011336.)  The record contained no further evidence of Defendant's research or investigation into TWH.

That same year, Defendant began selling promissory notes to his clients on TWH's behalf.  (*See* DE 57 at 104:24-104:25.)  The promissory notes were on properties located in Jackson, Mississippi.  (*Id.* at 190:1-191:3.)  Those properties were managed by TWH-MS, a subsidiary of TWH.  (Gov't Ex. 2N at USA-DFI-00009926.)  Through this investment structure, clients received interest on the note for a fixed period, and when that period expired, the clients would receive their principal back.  (DE 57 at 26:4-26:11; DE 58 at 31:4-31:18.)  Defendant received a commission on each note sold.  (DE 56 at 56:22-56:13, 56:18-56:32; DE 57 at 107:22-107:25, 162:21-163:8; DE 60 at 7:11-7:15.)  Clients testified that Defendant never explained the risks of their investment to them, provided them with a prospectus outlining those risks, or showed them any related financial information.  (DE 56 at 54:18-54:23; DE 57 at 113:9-113:15; DE 60 at 11:5-11:10.)  Instead, he only provided information to his clients about the projected post-renovation value of the properties, the projected rental amounts for the properties based on this hypothetical value, and the corresponding fixed interest rates.  (DE 57 at 213:25-214:6, 214:10-214:16.)  Further, clients were not advised that the value of the property may actually be less than the value of their notes because of other contingencies, such as the condition of the properties.  (*Id.* at 215:4-215:9.)

In July 2015, Defendant's clients began inquiring about the non-payment of their monthly interest and decreases in the amounts that they were paid.  (DE 58 at 31:22-31:25.)  In November 2015, TWH sent letters to clients informing them about challenges the company was facing.  (Gov't Ex. 2N at USA-DFI-00009926-USA-DFI-00009929.)  The letter described

mismanagement of funds by former members and managers of TWH-MS and noted that "TWH-MS is not currently in sound financial condition."  (*Id.* at USA-DFI-00009926-USA-DFI-00009927.)  It also stated, "Most if not all of the TWH-MS Portfolio Properties are located in crime-ridden neighborhoods. . . . [M]any properties have suffered unexpected property damage, and money that would have otherwise been retained as a cash reserve has been used to repair the properties and get them tenant ready."  (*Id.* at USA-DFI-00009927.)

During this same period, Michael Hanks, a member of TWH-MS, notified Defendant that bankruptcy was inevitable for TWH-MS.  (DE 57 at 216:12-217:22.)  Dallis Ketchum, a property manager for TWH-MS, also advised Defendant that many of the houses were still in "poor condition" and "uninhabitable," and he had a "constant struggle" with collecting rent.  (DE 58 at 156:14-156:20, 158:19-158:21, 159:17-160:2).  However, several of Defendant's clients testified that he never informed them about the impending bankruptcy or the inhabitability of the properties.  (DE 56 at 72:21-72:23, 73:10-73:12; DE 57 at 112:8-112:19, 199:2-199:4; DE 58 at 177:5-177:6; DE 60 at 10:2-10:4.)

TWH filed for bankruptcy in August 2016.  (DE 58 at 39:18-39:20.)  Defendant subsequently formed RPB Rental, LLC ("RPB") with Mr. Avery and Wendell Smith.  (DE 58 at 48:8-48:10, 49:7-49:11, 49:18-49:22, 50:4-50:8.)  RPB assumed the notes that Defendant's clients held through TWH and maintained the notes on the same property.  (*See* DE 57 at 229:19-229:25; DE 58 at 48:8-49:3, 50:12-50:16.)  Defendant was RPB's majority owner.  (DE 57 at 227:19-227:22.)  At trial, his clients testified that Defendant never informed them that he had an ownership interest in RPB.  (DE 56 at 66:5-66:6; DE 60 at 14:18-14:20.)  Defendant and Mr. Avery tried to find an investor for TWH, including Mr. Avery's mother and ASI Capital, but their attempts were unsuccessful.  (DE 58 at 4:9-14:13; DE 60 at 46:2-46:7.)  However, Defendant concedes that he never disclosed to his clients that the plan for Mr. Avery's mother to invest in TWH never materialized.  (DE 66 at 6.)  In July 2018, Defendant

3

also wrote a letter to his clients regarding a potential investor for RPB, recommending that clients consent to a transfer of ownership.  (Gov't Ex. 12G at USA-DFI-00013369.)

The Government submitted evidence that Defendant also performed legal work for RPB.  For example, he prepared legal documents on behalf of RPB.  (*See, e.g.*, Gov't Ex. 2T at USA-DFI-000024356,  USA-DFI-000024376,  USA-DFI-000024380,  USA-DFI-000024390; Gov't Ex. 4D at USA-00004419, USA-00004433; Gov't Ex. 12B at USA-DFI-000027070, USA-DFI-000027088, USA-DFI-000027095; Gov't Ex. 12D at USA-DFI-000023950; Gov't Ex. 14G at USA-DFI-000024285, USA-DFI-000024305; Gov't Ex. 14H at USA-DFI-000023226.)  Bank account records show that RPB paid "legal fees" to Defendant's law firm on at least two occasions.  (Gov't Ex. 7B at 88.)  Defendant's employee, Candace Bradley, testified that she and Defendant were performing legal work on RPB's behalf, and those legal fees were for the legal services that they performed for RPB.  (DE 58 at 102:5-102:7, 105:11-105:13, 114:25-115:2.)

According to Mr. Avery's testimony, RPB operated as follows: Investors were led to believe that their money was only used on their individual notes, but RPB would use money from one investor on the properties of other investors.  (DE 58 at 7:25-8:5.)  His assumption was that the pooled funds were also used to fulfill existing interest payments owed to other investors.  (*Id.* at 8:9-8:14.)  Jesse Vaughn, an examiner for DFI, also testified that RPB used the funds of one investor to pay another.  (*Id.* at 128:13-128:17.)  However, clients testified that they believed that their money would only be used on their individual notes.  (DE 60 at 17:14-17:16, 37:19-37:25.)

On October 8, 2021, the Government indicted Defendant Douglas Hawkins for one count of investment advisor fraud (15 U.S.C. §§ 80b-6 and 80b-17), one count of securities fraud (15 U.S.C. §§ 78j(b) and 78ff), and two counts of mail fraud (18 U.S.C. § 1341) in connection with these actions.  (DE 1.)

## II.    Motion for Acquittal

### A.    Standard

A judgment of acquittal under Federal Rule of Criminal Procedure 29 is only appropriate where the evidence presented at trial was insufficient to sustain the conviction. *United States v. Cox*, 593 F.2d 46, 48 (6th Cir. 1979) ("A motion for acquittal pursuant to Rule 29, Fed. Crim. P., takes the place of a motion for directed verdict and raises the question of whether the evidence is sufficient to support a verdict."). The Court "may 'reverse a judgment for insufficiency of evidence only if th[e] judgment is not supported by substantial and competent evidence upon the record as a whole.'" *United States v. Chaney*, 211 F. Supp. 3d 960, 966 (E.D. Ky. 2016) (quoting *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002)). Substantial evidence is evidence that a "reasonable mind might accept to support a conclusion." *Id*. at 967 (internal quotation marks omitted). In determining whether the evidence was insufficient to sustain a conviction, a court cannot weigh evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury. *Id*. at 967. "The Court thus will uphold a jury verdict 'if, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *accord United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016).

### B.    Fraudulent Intent

All arguments raised by Defendant relate to fraudulent intent, an element common to all four fraud counts. The jury instructions provided that the Government must establish that Defendant acted with "the intent to defraud" to prove he committed investment adviser fraud, securities fraud, and mail fraud. (Jury Instructions, Nos. 11, 16, 17.) As relevant to the facts of this case, "[t]he failure to disclose information may constitute a fraud if the

defendant was under a legal, professional, or contractual duty to make such a disclosure, the defendant actually knew such disclosure was required to be made, and the defendant failed to make such disclosure with the **specific intent to defraud**." (Jury Instructions, No. 13 (emphasis added).) "To act with 'intent to defraud' means to act with an intent to deceive or cheat for the purpose of depriving another of money or property, even in the short-term." (Jury Instructions, Nos. 15, 17.)

A defendant's good faith is a complete defense to fraud. (Jury Instructions, No. 18.) Good faith "encompasses, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another." (*Id.*) However, "[a] defendant's honest belief that a venture could succeed is not in itself a defense." (*Id.*)

The thrust of Defendant's motion is that the Government's evidence of fraudulent intent at trial was insufficient and contradicted by proof of Defendant's good faith. The Court will address each individual argument in turn. Viewing the evidence in the light most favorable to the Government, the Court finds that a rational trier of fact could have found that Defendant acted with the intent to defraud beyond a reasonable doubt.

### 1. Whether Defendant acted with due diligence in researching and investigating TWH and its investments

First, Defendant argues that he acted with due diligence in researching and investigating TWH and the investments it offered in line with his fiduciary duty. (DE 62-1 at 6-10.) Parties agree that this duty included the duty to investigate both TWH and the investments themselves so that Defendant could make adequate recommendations to clients. (*See id.* at 6; DE 63 at 10.) Defendant claims that he fulfilled this duty by researching TWH and communicating with DFI. (DE 62-1 at 6-8.)

### a.   Defendant's Research and Communications with DFI

Defendant points to evidence that he traveled to Oregon to meet with TWH associates, visited TWH offices, and reviewed available financial information.  (Gov't Ex. 17-A at 30:06-32:30.)  He also cites to an email that he sent to an examiner at DFI, writing, in part:

> I also have a question about a company I have received information on.  They solicit mortgage notes from private individuals.  The company is True Wholesale Houses. . . .
>
> If this company checks out financially and otherwise – they have letters on their website from a law firm in Mississippi where many of these houses are located that are being mortgaged.  They also have a recommendation from a national Title Company.  Obviously far more due diligence would need to be done.  The investor holds the mortgage note and receives interest payments as well as participates in the equity redemption. . . Could you give me some guidance?  Would this be a viable investment alternative and recommendation for clients?  What sort of liability would be involved as an RIA?  What sort of disclosures need to be included?  Am I permitted to explore these types of investments with clients? . . .

(Gov't Ex. 2Z at USA-00011337.)   In response, the examiner sent him a set of applicable statutes and regulations, and advised him of the disclosures that he would need to include in any advertising.  (*Id.* at  USA-00011336.)

Defendant further states that DFI was "wholly lacking" in providing answers to his questions and failed to refer him to counsel as is typical when receiving similar questions. (DE 62-1 at 7-8.)  In essence, Defendant argues that the real issue is that DFI did not provide him with adequate information, not that he failed to conduct a proper investigation of TWH.

The Court first notes that Defendant's focus is misplaced—the relevant inquiry is whether *Defendant* failed to undertake a sufficient investigation in violation of his fiduciary duty.  Defendant, not DFI, was responsible for completing due diligence in researching TWH.  Ultimately, DFI's alleged shortcomings are irrelevant to whether Defendant acted with the intent to defraud.  Defendant was indicted for fraud; DFI was not.  In any event, Defendant avoids the fact that, at the time of the underlying conduct, he was a practicing attorney who

was presumably familiar with how to interpret statutes and capable of discerning when further legal counsel was needed.

Even though he recommended that his clients invest with TWH, substantial evidence shows that Defendant did not fully educate himself about TWH or its investments, despite his undisputed obligation to do so. Defendant did not review any appraisals of the investment properties or any county assessments of property value. (DE 57 at 213:16-213:21.) He did not educate himself about any repairs the houses needed or the true value of the houses. (*Id.* at 214:217-214:22.) Instead, he only provided information to his clients about the projected post-renovation value of the properties, the projected rental amounts for the properties based on this hypothetical value, and the corresponding fixed interest rates. (*Id.* at 213:25-214:6, 214:10-214:16.) Clients were not advised that the value of the properties may actually be less than the value of their notes because of other contingencies, like the potential disrepair of the houses. (*Id.* at 215:4-215:9.) Yet Defendant knew of his obligation to "provide all material information" about the investments to his clients because that obligation was detailed in the set of statutes that DFI sent to him. (Gov't Ex. 2Z at USA-00011335.) Based on this, a reasonable mind could conclude that Defendant avoided this obligation because the information he discovered may dissuade clients from investing. A reasonable mind could further conclude that Defendant breached his duty in this way to deceive his clients and receive their money, and in doing so, acted with the intent to defraud. [2]

---

[2] Even if Defendant adequately researched TWH and its investment offerings, the fact that Defendant conducted proper due diligence prior to making investment recommendations to his clients does not nullify the possibility that he later engaged in fraudulent activity by failing to disclose the fruits of that research to his clients or other material information.

### b.      Defendant's Ability to Obtain a Prospectus

Relatedly, Defendant also challenges the Government's argument at trial regarding his failure to obtain and provide a prospectus for TWH, which would have shown that TWH was under a cease-and-desist order for selling the securities offered.  (DE 62-1 at 8-10.)  According to Defendant, that information is only obtained through an access letter, which is a request reserved for state entities obtaining nonpublic documents from one another.  (*Id.* at 9 (citing DE 60 at 86:12-86:23).)  Further, TWH has a practice of not releasing financials to other companies and maintains that information confidentially with its owners.  (DE 57 at 88:16-89:2.)  Therefore, Defendant argues, his failure to obtain this information is not a breach of his fiduciary duty because he was "incapable" of acquiring it, and therefore, that failure is not evidence of his fraudulent intent.  (DE 62-1 at 9.)

However, as the Government states, no evidence exists to show that Defendant attempted to obtain this information or create a prospectus, although he had a duty to educate himself about the investments and provide his clients with all material information related to them.  A rational factfinder could accordingly find that, by failing to even attempt to acquire this information and share it with his clients (regardless of his ultimate ability to obtain such information), Defendant breached his fiduciary duty to them.  That is, the lack of evidence itself supports the conclusion that Defendant acted with fraudulent intent.

### c.      Client Disclosures

Defendant also seems to argue that, regardless, investors were "aware of the potential risks" of the investments because of the disclosures they signed.  (DE 62-1 at 9-10.)  The disclosures stated that clients acknowledge that their investments are "neither guaranteed nor insured against default, other than with a secured mortgage interest and deed of trust in the residential real estate offered as collateral."  (Gov't Ex. 4F at USA-DFI-00045647.)  The disclosures further provided that clients were advised that they must "foreclose on the

mortgage to enforce [their] security interest[s] in the property" in case of default and "accepted the default risks associated with [these] mortgage note[s]." (*Id.*) This argument is illogical and needlessly shifts the blame to Defendant's alleged victims. Notably, by their terms, the disclosures do not reveal the true risk of the underlying investments, such as the actual value of the properties or their condition. Clients could not be aware of the risks that Defendant never disclosed to them. (*See* DE 57 at 213:25-214:8, 214:10-214:16, 215:4-215:9.) As substantial evidence shows, Defendant did not advise his clients of the substantial risks associated with their investments—William Peterson, Donna Marsh, and Allen Waugh all testified that Defendant never explained the risks of the investments to them, provided them with a prospectus outlining those risks, or showed them any related financial information. (DE 56 at 54:18-54:23; DE 57 at 113:9-113:15; DE 60 at 11:5-11:10.) And Defendant could not plausibly disclose to clients the information he did not possess or take the steps to acquire in violation of his fiduciary duty.

Altogether, the evidence of Defendant's failure to conduct adequate due diligence of TWH and its investment offerings is sufficient to support the conclusion that he acted with the intent to defraud his clients.

### 2. Whether Defendant omitted material information about TWH's financial distress and the condition of their properties.

Next, Defendant argues that he did not omit material information about TWH's financial distress or concerns about the condition of their properties. (DE 62-1 at 10-12.) Instead, his clients were aware of these concerns because Mr. Hanks, a member of TWH-MS, sent them a letter detailing these issues on November 13, 2015. (*Id.*) The relevant statements from that letter are as follows:

10

- "A number of factors have resulted in a decrease in revenues and increase in operating expenses in the TWH-MS Portfolio Properties, making the ability of TWH-MS to meet its obligations under your note impracticable at this time."

- "[I]n late 2013, I discovered that the former members and onsite managers for the TWH-MS Portfolio were not managing TWH-MS Portfolio Properties in a prudent and responsible manner and were not keeping the TWH-MS Portfolio continuously rented.  I suspected that rental income was being used for expenses unrelated to the Portfolio . . ."

- "[O]ver time I have come to realize that most if not all of the TWH-MS Portfolio Properties are located in crime-ridden neighborhoods.  The properties, particularly when left vacant for any period of time, have been the subject of trespass and vandalism.  As a result, many properties have suffered unexpected property damage, and money that would have otherwise been retained as a cash reserve has been used to repair the properties and get them tenant ready."

- ". . . TWH-MS is not currently in sound financial condition.  For instance, the property taxes are past due for most of the TWH-MS Portfolio Properties.  Notwithstanding the unpaid property taxes, I do not believe that the TWH-MS Portfolio Properties are in any immediate danger of foreclosure . . . at this time.  If our financial condition does not improve, which is likely the case that might cause us to default on your Note."

(Gov't Ex. 2N at USA-DFI-00009926-USA-DFI-00009929 (emphasis in original).)  Therefore, Defendant's apparent position is that because TWH provided this information to his clients, he had no duty to inform them about these circumstances.  (DE 62-1 at 11-12.)

In raising this challenge, Defendant concedes the entire point of the Government's argument.  His stance is that because TWH—an entity separate and apart from Defendant—disclosed concerns about its financial distress and the poor condition of its properties to investors, he didn't have to.  Essentially, Defendant admits that he, indeed, omitted material information from his clients.  But the fact that his clients may have received this information elsewhere did not absolve Defendant of his ongoing duty to "provide all material information" about the investments to his clients.  (Gov't Ex. 2Z at USA-00011335.)  The omission itself is sufficient to conclude that Defendant withheld information to deceive his clients and acted with fraudulent intent.

11

Moreover, the November 2015 letter fell short of providing investors with all the material information about their investments. For one, not every client received the letter. (*See* Gov't Ex.1E at USA-DFI-00009221.) Substantial evidence shows that the letter was, at best, inaccurate. While the letter stated that TWH-MS Portfolio Properties was not in "any immediate danger of foreclosure" as of November 2015, Mr. Hanks notified Defendant around that same time period that bankruptcy was inevitable for TWH-MS. (DE 57 at 216:12-217:22.) Even though TWH did not actually file for bankruptcy until August 2016, a rational juror could find that management plausibly foresaw that event months earlier. Similarly, while the letter stated that "money that would have otherwise been retained as a cash reserve **has been used to repair the properties** and get them tenant ready," Mr. Ketchum advised Defendant that many of the houses were still in "poor condition" and "uninhabitable," and he had a "constant struggle" with collecting rent. (DE 58 at 156:14-156:20, 158:19-158:21, 159:17-160:2.) Despite his knowledge of the actual condition of TWH's finances and its properties, Defendant failed to disclose the discrepancies between the letter and the reality of TWH's circumstances to his clients. His former clients William Peterson, Donna Marsh, Phyllis Peterson, and Jennifer Linn all testified to that effect. (DE 56 at 72:21-72:23, 73:10-73:12; DE 57 at 112:8-112:19, 199:2-199:4; DE 58 at 177:5-177:6; DE 60 at 10:2-10:4.) Defendant's failure to disclose material information to his clients is sufficient to show that he acted with fraudulent intent.

### 3. Whether Defendant continued a failed business model

Defendant also argues that the Government's position at trial was that TWH failed solely due to its business model. (DE 62-1 at 13.) But, Defendant contends, the fact that the business model failed does not make it fraudulent. (*Id.*) Ultimately, the extent to which TWH and its subsidiaries failed or succeeded is irrelevant to the element at issue in Defendant's motion: fraudulent intent. The jury instructions on the good faith defense

specifically provide, "A defendant's honest belief that a venture could succeed is not in itself a defense." (Jury Instruction, No. 18.) Accordingly, the success of TWH has no bearing on whether Defendant failed to provide material information to his clients about their investments and did so with the intent to deceive them for "the purpose of depriving [them] of money." (Jury Instructions, Nos. 15, 17.) Since TWH's business model is not relevant to Defendant's intent, the Court cannot grant the motion for acquittal on this ground.

> 4.    **Whether Defendant falsely represented or omitted material facts related to RPB**

In his next set of arguments, Defendant claims that he did not omit material information regarding RPB, including its ownership, its search for investors, or any money he personally gained from the venture. (DE 62-1 at 14-16.)

> a.    **Ownership of RPB**

Substantial evidence exists to support the conclusion that Defendant acted with the intent to defraud when he failed to disclose his ownership interest in RPB to clients. Defendant told Mr. Avery that it "would be best from a conflict of interest standpoint" if they did not own the company because they would be acting as investment advisors on both sides of the transaction. (DE 57 at 225:6-225:14, 226:1-226:9.) However, Defendant later became a majority owner of RPB, while still acting as an investment advisor for his clients. (*Id.* at 227:19-227:22.) Even though Defendant signed his name to indicate he was a representative of RPB, clients testified that Defendant never told them he was actually an owner of RPB.[3]

---

[3] In his reply, Defendant cites to an email in which Mr. Avery writes, ". . . Doug and I have formed a company in [Mississippi] and have successfully taken over all of our client's properties there." (DE 66 at 7.) However, the extent to which *Defendant* disclosed his conflict of interest was the issue at trial, not the extent to which Mr. Avery may or may not have disclosed any conflicts. In any event, testimony from multiple clients that Defendant did not disclose his ownership in RPB is sufficient evidence from which a reasonable mind may conclude that he had fraudulent intent.

(DE 56 at 66:5-66:6; DE 60 at 14:18-14:20.)  And, Mr. Avery confirmed that he was not sure if Defendant actually disclosed any conflict of interest to investors.  (DE 57 at 227:13-227:18.)  Around that same time, Defendant expressed concerns to Mr. Avery about how TWH's bankruptcy would affect his reputation with his clients and his church congregation, and emphasized that they needed a fallback plan.  (*Id.* at 220:17-221:23.)  Based on Defendant's failure to disclose his conflict of interest to clients and his overarching concerns about his reputation, a reasonable mind could find that this evidence supports the conclusion that Defendant acted with the intent to defraud to save his reputation and to prevent the conflict from deterring clients to invest with him.  This is enough to overcome Defendant's motion for acquittal.

Defendant contends that RPB's filing with the Mississippi Secretary of State lists him as a member of RPB, and each note listed Defendant as a "member" of RPB.  (Gov't Ex. 2S at USA-DFI-00001494; *see, e.g.,* Gov't Ex. 2T at USA-DFI-00024368.)  Therefore, according to Defendant, he did not misrepresent his ownership in RPB.  However, a rational juror could find that Defendant's obligation to disclose his ownership to his clients required more, such as requiring him to discuss what it meant for him to act as a "member" of RPB, the nature of his conflict of interest, and how that conflict could impact investment transactions.  Regardless, the Court's role on a motion for acquittal is not to weigh the evidence but to determine if substantial evidence supports the conviction.  *Chaney*, 211 F. Supp. 3d at 966-67.  Here, based on the testimony from Mr. Avery and Defendant's clients, substantial evidence supports the conclusion that Defendant acted with the intent to defraud when he failed to disclose his conflict of interest to clients.

### b.  RPB's Potential Investors

Defendant states that he and Mr. Avery initially expected that Mr. Avery's mother would invest in RPB after TWH's failure, but that plan never materialized  (DE 62-1 at 14.)

However, Defendant claims that no evidence in the record shows that he acted with fraudulent intent when he failed to update clients about the status of her investment in RPB. (*Id.*)  Instead, he notified clients of his plan to maintain the viability of their investments. (Gov't Ex. 16D at USA-DFI-00029428.)

William Peterson, Jennifer Linn, and Allen Waugh testified that Defendant advised them that Mr. Avery's mother was investing in RPB and would take control of the company. (DE 57 at 194:16-194:22; DE 58 at 177:19-177:21, 178:8-178:11; DE 60 at 11:11-11:14.)  As Defendant concedes, he did not tell clients that Mr. Avery's mother failed to invest in RPB. (DE 66 at 6.)  By informing clients that RPB found an investor but failing to notify them when the arrangement fell through, a rational juror could conclude that Defendant did so to instill a false confidence in his clients that RPB was viable so that clients would keep investing with RPB.  This is competent evidence showing that, in representing the ownership of RPB, Defendant acted with an intent to deceive his clients and deprive them of the money that they invested, even if only in the short-term.

Defendant also argues that the Government has not provided sufficient evidence that he falsely represented that ASI Capital would take over RPB.  (DE 62-1 at 14-15.)  He references a July 2018 letter in which he wrote, "[W]e are writing to make you aware of developments that present RPB with the opportunity to transfer ownership of the houses to an experienced private investment group.  This investment group's management team has successfully acquired and maintained ownership interests in hospitals, a hotel, student housing, and an office complex."  (Gov't Ex. 12G at USA-DFI-00013369.)  At trial, ASI Capital's owner, Clem Borkowski, testified that the description "*could*" match ASI Capital, but he did not know if the letter was referring to his company.  (DE 60 at 45:1-45:9 (emphasis added).)

15

But the July 2018 letter stated, RPB "need[s] your written consent as a mortgage holder" to make the transfer and that it "highly recommends this option." (Gov't Ex. 12G at USA-DFI-00013369.)   The letter also requested permission to "defer [clients'] interest payment[s]" to "giv[e] us time to transfer all properties over to the new investment group." (*Id.*)   Mr. Avery and Mr. Borkowski confirmed that they spoke about the possibility of ASI Capital taking over RPB during this timeframe.   (DE 58 at 15:7-15:15; DE 60 at 47:5-47:7.) Despite the representation in the July 2018 letter otherwise, ASI Capital never made any offers to acquire RPB, and RPB never even came close to a deal with ASI Capital.   (DE 58 at 16:7-16:11; DE 60 at 46:2-46:7.)   Viewing the evidence in the light most favorable to the Government, a rational juror could have found that Defendant was referring to ASI Capital in the July 2018 letter, given that the letter included language strongly suggesting that a private investment group was taking over RPB, the description of the investment group matched that of ASI Capital, and the letter was drafted during the same time period that ASI Capital was engaged in discussions with RPB about a potential deal.   Further, a rational juror could have found that Defendant sent this letter to clients with the intent to defraud them because, in reality, ASI Capital never made any offers to RPB, nor did the two entities ever come close to a deal.   Although Defendant later notified clients that RPB never consummated a deal with the investment group, that notification was not sent to investors until October 2019, over a year after Defendant first represented the possibility of the transfer.   (Gov't Ex. 16D at USA-DFI-00029428.)   Since the Government only has to show that Defendant intended to deprive his clients of money (here, their investments) in the short-term, this is sufficient evidence that Defendant acted with fraudulent intent.

### c.    Defendant's Legal Work for RPB

Defendant next argues that neither he nor his law firm earned legal fees on work completed for RPB.   (DE 62-1 at 15.)   Defendant provided some clients with a waiver that

stated, "Attorney will not be acting as a lawyer for any attorney in this matter."  (Gov't Ex. 2U at USA-DFI-00014599.)  Defendant mischaracterizes the evidence.  Evidence shows that Defendant prepared several legal documents on behalf of RPB, including deeds of trust and releases.  (Gov't Ex. 2T at USA-DFI-000024356, USA-DFI-000024376, USA-DFI-000024380, USA-DFI-000024390; Gov't Ex. 4D at USA-00004419, USA-00004433; Gov't Ex. 12B at USA-DFI-000027070, USA-DFI-000027088, USA-DFI-000027095; Gov't Ex. 12D at USA-DFI-000023950; Gov't Ex. 14G at USA-DFI-000024285, USA-DFI-000024305; Gov't Ex. 14H at USA-DFI-000023226.)  Bank account records also show that RPB paid "legal fees" to Douglas Hawkins Law, PLLC on at least two occasions.  (Gov't Ex. 7B at 88.)  Ms. Bradley confirmed that she and Defendant were performing legal work on RPB's behalf, and those legal fees were for the legal services that they performed for RPB.  (DE 58 at 102:5-102:9, 105:11-105:13, 114:24-115:1.)

Defendant claims that the fees paid to Douglas Hawkins Law, PLLC actually "were for the purpose of paying [Ms. Bradley's] salary."  (DE 62-1 at 15.)  To support this contention, Defendant cites to testimony from Ms. Bradley.  (*Id.*)  In response to the question of whether her salary "was always paid out of the law firm account," Ms. Bradley answered, ". . . I think part of my salary was out of law and then all of it was out of law, because it was all Doug's, RPB."  (DE 58 at 114:13-114:18.)  She further testified that the money was eventually paid to Walter Cox because she was working for him, but she was "absolutely" still working for RPB.  (*Id.* at 114:19-114:23.)  She clarified that the money was paid for her work with RPB but she "[didn't] know if the 4,000 went – that was my salary."  (*Id.* at 114:24-115:1.)  When asked again if the legal fees represented her salary, Ms. Bradley stated, ". . . I don't know, you know --."  (*Id.* at 115:2-115:3.)  Not only was Ms. Bradley's response equivocal, but no evidence shows that the fees were paid *solely* to fund Ms. Bradley's salary.  Instead, substantial evidence shows that, contra to the language of the waiver, Defendant indeed

17

performed legal work for RPB and earned fees for that work.  Therefore, a reasonable mind could conclude that, by failing to disclose to his clients that he was simultaneously working as a lawyer for RPB, Defendant acted with fraudulent intent.

### d.    Defendant's Personal Contributions to RPB

Finally, Defendant contends that he actually contributed $20,000 of his own personal money to RPB, presumably as evidence of his good faith.  (DE 62-1 at 16.)  In support of this claim, Defendant points to RPB's General Ledger, which showed a beginning balance of $18,605.49.  (Gov't Ex. 7C at 87.)  But, viewing evidence in the light most favorable to the Government, the evidence suggests that the deposit did not originate from Defendant's personal funds.  The beginning balance does not identify the source of the $18,605.49, i.e., the account does not indicate that the deposit came from Defendant himself.  Ms. Bradley testified that RPB used a personal savings account created under Defendant's name, but "there wasn't anything of his personal in it, it was all RPB."  (DE 58 at 96:12-96:14.)  This evidence supports the conclusion that the $18,605.49 did not come from Defendant.

In sum, the Government submitted sufficient evidence from which a rational juror could conclude that Defendant acted with the intent to defraud his clients in mispresenting and omitting material facts about RPB.

### 5.    Whether Defendant fraudulently omitted or misrepresented the value of the houses acquired by RPB

Defendant's final line of arguments relate to whether he omitted or misrepresented the true value of the houses acquired by RPB and used as collateral for the transferred notes.

### a.    Defendant's Interview with DFI

Defendant first references a clip from his interview with DFI, arguing that the Government played the clip without context.  In that conversation, Defendant and the DFI

representative discussed the uninhabitable houses that RPB acquired from TWH.  (Gov't Ex. 17-A at 1:12:12-1:13:05.)  The relevant portion of the conversation is as follows:

> Q:      And has that been communicated to the note holder?
>
> A:      Yes, in part.

(*Id.*)  According to Defendant, he was not referring to *all* of the houses in RPB's portfolio.  (DE 62-1 at 17.)  Viewing the evidence most favorably to the Government, a rational juror could conclude that Defendant omitted material information from his clients by only communicating information about the unhabitable houses to them "in part."  This is sufficient evidence to conclude that Defendant acted with the intent to defraud.

### b.      Pooling of Investor Funds

Next, Defendant argues that RPB properly pooled investor funds because REITs customarily function by pooling funds.  (DE 62-1 at 17.)  Additionally, he maintains that the Government's expert, Colleen Keefe, never testified that Defendant breached his fiduciary duty in failing to disclose that RPB was pooling client funds.  (DE 66 at 9.)

As the Government notes, the issue at trial was not whether a REIT that pools funds is proper; instead, the issue was whether Defendant intended to defraud his clients by failing to inform them that their money was pooled in this way.  Substantial evidence shows that Defendant did not inform his clients that their money would be pooled with that of other investors.  Mr. Avery testified that he and Defendant never told their clients that their money could be used on the properties of other investors.  (DE 58 at 7:25-8:2.)  Instead, clients were led to believe that their money would only be used on their individual notes.  (*Id.* at 8:3-8:5.)  Indeed, both Allen Waugh and Diane Milburn testified that they thought their money would only be used on their houses and were never told otherwise.  (DE 60 at 17:14-17:16, 37:19-37:25.)  Although Ms. Keefe did not testify regarding the pooling of investments, a reasonable mind could conclude that Defendant breached his fiduciary duty when he failed to disclose

that RPB pooled client funds.  Multiple clients testified that, if they had known that their funds would be used on other houses or to pay other investors, they would not have invested with RPB.  (*Id.* at 17:17-17:20, 38:1-38:2.)  This suggests that the pooling of funds was material information that Defendant needed to provide to his clients.  Because the evidence indicates that Defendant did not inform his clients that RPB pooled their money to use on other houses or pay other investors, a reasonable mind could conclude that Defendant omitted this information with the intent to defraud his clients and obtain their investments.

### c.      Testimony Regarding Property Value

Defendant takes a scattershot approach in raising his final challenges to evidence that Defendant fraudulently omitted or misrepresented the value of the houses underlying the notes, specifically honing in on testimony presented at trial.  (DE 62-1 at 17-18.)  Defendant first takes issue with testimony from Jesse Vaughn, the examiner for DFI.  (*Id.*)  Mr. Vaughn testified regarding a payment that Dee Schlesser made in connection with a property at 615 Green Street.  He concluded that her $95,000 payment was "significantly larger than the previous investment."  (DE 58 at 128:9-128:22.)  According to Defendant, this is not enough to establish fraudulent intent because the Government provided no proof of "the terms of her agreement with RPB Rental, her understandings of the investment funds and how they were to be used, or the value of the property at the time the investment was made."  (DE 62-1 at 17-18.)

However, documents showed that RPB bought the 615 Green Street property on September 20, 2016, for $36,500.  (Gov't Ex. 12B at USA-DFI-00027092.)  Defendant then sold a note on that same property to John and Dianne Milburn for $70,000 on September 23, 2016.  (USA-DFI-00027108-USA-DFI-00027112.)  Only four months later, in January 2017, Defendant sold another note on that property to Ms. Schlesser for $95,000.  (*Id.* at USA-DFI-00027083-USA-DFI-00027087.)  Mr. Vaughn then testified that Defendant used the money

from Ms. Schlesser to pay off the former investor, Mr. Milburn.  (DE 58 at 128:13-128:17.)  A rational juror could conclude that Defendant misrepresented the value of the houses based on the discrepancy between the amount RPB paid for the 615 Green Street property and the amount the Milburns paid to invest in the property only three days later, and the discrepancy between the amount that the Milburns paid on the note and the amount that Ms. Schlesser paid just four months later.  Moreover, a rational juror could find that, based on the timing of the payments and Mr. Vaughn's testimony, Defendants used Ms. Schlesser's money to pay off the Milburns.  Accordingly, the Government offered sufficient evidence of Defendant's fraudulent intent to sustain his convictions.

Defendant then states that Mr. Jacobson's payment "was supported by nothing more than the deed of trust," and "[t]he mere fact that this money was pooled and used towards other properties is not indicative of fraudulent intent."  (DE 62-1 at 18.)  Defendant reiterates that the record contains "no evidence or testimony . . . indicating that the investor was unaware or did not consent to the use of the invested funds in this manner."  (*Id.*)  As the Court previously found, the problem is not that RPB pooled client funds, but that Defendant failed to inform clients that their money was pooled.  Mr. Avery testified that, to his knowledge, Mr. Jacobson was never told that his money would be used to pay other investors.  (DE 58 at 9:3-9:5.)  That Defendant did not inform Mr. Jacobson and other clients about the pooled funds is sufficient evidence of fraudulent intent.

Substantial evidence otherwise shows that Defendant omitted or misrepresented the values of the properties.  According to the testimony of clients, Defendant never shared property appraisals with them.  (DE 57 at 107:5-107:6, 191:14-191:16; DE 60 at 16:17-16:19, 22:18-22:19, 36:11-36:12.)  Testimony also indicates that Defendant never told his clients the true value of the houses and only provided the projected rental income.  (DE 57 at 214:10-215:19; DE 58 at 176:1-176:3.)  And several clients testified that they were under the

assumption that the value of the relevant note was equal to the value of the house used as collateral.  (DE 57 at 107:10-107:12; DE 60 at 6:18-6:20, 7:5-7:8, 36:16-36:19.)  Because evidence shows that Defendant withheld this material information while under a known duty to provide that information to his clients, a reasonable mind may conclude that he acted with the intent to defraud his clients and obtain larger investments from them.

Overall, a rational juror could find beyond a reasonable doubt that Defendant possessed fraudulent intent when omitting and misrepresenting the value of the houses acquired by RPB.

### 6.  Other Evidence of Fraudulent Intent

In addition to the evidence discussed above, the Government also provided substantial evidence competent to establish Defendant's fraudulent intent in his interactions with clients.  Evidence indicates that Defendant comingled client funds with his own personal funds.  For example, bank records show that Defendant transferred $70,000 from his IOLTA account to his personal account.  (Gov't Ex. 8E-1 at USA-00007288; Gov't Ex. 8F-3 at USA-00005879.)  Defendant subsequently drafted checks to investors from his personal account.  (DE 58 at 136:11-136:20, 137:7-137:17.)  In reality, the $70,000 actually originated from Everett Jacobsen, another investor.  (*Id.* at 130:15-140:17.)  A reasonable juror could conclude that Defendant comingled his funds in this way to conceal the source of the funds and create the appearance that he paid the investor with his own funds.  In turn, a reasonable juror could conclude that such concealment shows that Defendant acted with an intent to defraud.

### 7.  Witness Credibility

To the extent that Defendant demands that the Court view the testimony of investors with the "utmost caution" (DE 62-1 at 18), the Court cannot consider the credibility of witnesses on a motion for acquittal.  *Chaney*, 211 F. Supp. 3d at 967.  Even if it could, nothing about the credibility of these witnesses gives the Court pause.  The basis of Defendant's

argument is that investors did not raise complaints about Defendant until they received communications about the investigation from DFI.   But that's the point of the Government's theory—the investigation revealed a fraudulent scheme that Defendant never disclosed to his clients.   And, Defendant has failed to point to any evidence that the postal inspector's allegedly suggestive "investigative techniques" indeed impacted a witness's testimony.   (DE 62-1 at 18.)

None of the arguments advanced by Defendant convince the Court that the evidence presented at trial was insufficient to sustain the conviction.   *See Cox*, 593 F.2d at 48.   To the contrary, substantial and competent evidence supports the conclusion that Defendant acted with the intent to defraud.   Accordingly, the Court denies Defendant's motion for acquittal.

### III.   Motion for New Trial

The Court may grant a motion for a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a).   The "interest of justice" standard calls for a new trial only "where substantial legal error has occurred."   *United States v. Duerson*, Criminal Action No. 5:19-130-DCR, 2022 WL 5199724, at *1 (E.D. Ky. Oct. 5, 2022) (citation and quotation marks omitted).   A substantial legal error is one that would "require reversal on appeal."   *See United States v. Carman*, 186 F. Supp. 3d 657, 670 (E.D. Ky. 2016).   If the motion challenges the weight of the evidence, the Court may assess both the credibility of the witnesses and the weight of the evidence.   *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998).   In this way, the Court acts as the "thirteenth juror."   *Id.*   In considering a motion for a new trial, the Court retains "wide discretion."   *United States v. Thompson*, Criminal No. 07-35-GFVT, 2009 WL 331482, at *8 (E.D. Ky. Feb. 9, 2009) (citation and quotation marks omitted).   Such motions are "disfavored" and granted "with caution."   *Id.*   Accordingly, the Court grants a new trial

"only in the *extraordinary circumstances* where the evidence preponderates heavily against the verdict." *Id.* (emphasis in original) (citation and quotation marks omitted).

Looking at the record as a whole, the Court does not find that a new trial is in the interest of justice. The Court sees no substantial legal error that would require reversal on appeal. Assessing the credibility of witnesses and the weight of the evidence, the Court finds that this is not an extraordinary circumstance where the evidence preponderates heavily against the verdict for all of the reasons provided above. Considering that motions for a new trial are only granted with caution and using the Court's wide discretion, the Court denies Defendant's motion for a new trial.

## IV.   Conclusion

Accordingly, the Court hereby ORDERS that Defendant Douglas Hawkins' motion for acquittal or, in the alternative, for a new trial (DE 62) is DENIED.

This 4th day of May, 2023.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY